1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT J. DUSTMAN, | ) 1:09-cv-00875 GSA |
| | ) |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

**BACKGROUND**

Plaintiff Robert J. Dustman ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

25
26
27
28

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 9 & 10.

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his application on or about April 13, 2004, alleging disability beginning December 5, 1998.  AR 126-129.  His application was denied initially and on reconsideration; thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 68-73, 79.  ALJ James S. Carletti held a hearing on July 2, 2007, and issued an order denying benefits on August 18, 2007.  AR 54-63, 86-90.  On January 11, 2008, the Appeals Council vacated ALJ Carletti's decision and remanded the matter for a new administrative hearing proceeding.  AR 65-67.  Upon remand, the Appeals Council directed as follows:

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations [citation].  In so doing, evaluate the nonexamining source opinions in accordance wit the provisions of 20 CFR 404.1527(f) and . . . 96-6pm, and explain the weight given to such opinion evidence.
> Evaluate the lay statements given by the claimant's spouse pursuant to the adjudicative provisions set forth in 20 CFR 404.1513(d)(4) and . . . 06-3p, as part of the assessment of the claimant's credibility.
> Depending on the limitations and/or restrictions ultimately found, determine whether further evidence from a vocational expert is needed.

AR 67.

ALJ Christopher Larsen conducted an administrative hearing on June 24, 2008, and issued an order denying benefits on July 25, 2008.  AR 15-20, 115-119.

## Hearing Testimony

ALJ Larsen held a hearing on June 24, 2008, in Fresno, California.  Plaintiff appeared and testified via video conference from Bakersfield.  He was represented by attorney Joshua Potter.  Gloria Dustman, Plaintiff's wife, also testified.  AR 421-463.

Plaintiff was fifty-two years old at the time of the hearing.  AR 427.  He is six feet, two and a half inches tall and weighs 400 pounds.  For the previous nine years, 400 pounds has been his usual weight.  At the time of his heart attack, he weighed about 300 pounds.  AR 440.  He cannot exercise because he suffers from a shortness of breath and cramping in his extremities due to arteriosclerosis.  AR 440.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff last worked on January 15, 1999, as a material manager for "Slumber J." He maintained the chemical inventory and mixed and blended chemicals. AR 427. It was customary for him to lift and carry one hundred pound sacks of material. He performed that type of work for nearly twenty years before being terminated because he could no longer perform his job. The stress of new regulations and the amount of physical labor required were too much. AR 427-428.

About the time he was treated for a heart attack and arteriosclerosis, Plaintiff was initially followed by cardiologist Metta. About three months later, he began treating with Dr. Desai, whom he has seen ever since. AR 428.

Plaintiff currently suffers from both physical and mental problems. AR 429. He has been under the care of a psychiatrist for about three years. AR 429. He is being treated for depression, in part because he does not "fit in comfortably with people anymore" and prefers to be alone. AR 430. Plaintiff does not feel good about himself as he has "nothing to do in life" or "nothing to live for except my firm belief in, you know, my beliefs." AR 430. Previously, Plaintiff suffered from "fairly active suicidal thoughts," but he does not suffer from that problem to the same extent today. AR 431. He feels worthless because he can longer be a provider for his family. His wife acts as his caretaker and he is "not a blessing to [his] grandkids" because he cannot play with them or build things with them; he cannot be a teacher or mentor. AR 434. Plaintiff has been depressed since 2001, after two years of being told he "can't do anything anymore." AR 437-438. He continues to see a psychiatrist, but his condition has not improved much. AR 438. His treating psychiatrist has told him that his condition should not worsen as a result of the medications prescribed, but that the "situation controls [him] getting better. And [his] situation is what it is and that's what she says." AR 448.

Plaintiff has no social life and considers himself to be a recluse. He does not want to go out because he cannot "party" or dance anymore. People look at him with disdain. He sees his wife's family if they come to his home, however, he will "hide" by finding "a way to go upstairs," in order to avoid being uncomfortable. AR 435. For example, the day prior to the hearing, his wife's family came by the house to enjoy the back porch, but Plaintiff remained

1  upstairs.  AR 436.  He believes his wish to avoid people and family is a combination of
2  depression and stress.  AR 447.  For example, if he spends time with family and the conversation
3  turns to something he is not comfortable discussing, he will experience an episode of chest pain
4  due to the stress.  AR 447.

5  Following the heart attacks, Plaintiff has been unable to concentrate.  Simple things, like
6  looking something up on the computer, cause his attention to wander.  For example, he can only
7  stay on the computer for five to ten minutes maximum, otherwise he will lose focus.  AR 434-
8  435.

9  Asked whether he had difficulty sleeping, Plaintiff stated he cannot get a good night's
10  sleep and takes "[c]atnaps here and there."  AR 431-432.  He explained his "sleep is interrupted
11  by [his] physical condition and . . . lethargy."  AR 432.

12  Plaintiff still mows his own lawn, however, he uses a self-propelled mower and when his
13  legs give out he takes a break, either sitting down with a glass of ice tea or lying down,
14  depending upon the pain and cramps.  It takes him two to three days to mow the lawn in an area
15  100 feet by 120 feet.  AR 433.  Likewise, Plaintiff will start to do laundry by picking it up and
16  putting in the basket, but it will be the next day before he takes it down to the washer.  AR 436-
17  437.  He has a garden he "like[s] to nurture," and he will start to fertilize the garden but will not
18  finish the project.  A week will go by before his wife reminds him that he's left the project
19  incomplete.  AR 437.

20  The decreased energy Plaintiff feels also affects his ability to walk and climb.  If he
21  climbs stairs or walks an area with "even a little bit of a grade," Plaintiff's legs give out and
22  "burn."  However, ninety percent of the time, sitting down "doesn't cure it."  AR 433.  There are
23  stairs in Plaintiff's home and his bedroom is upstairs.  If he has difficulty climbing the stairs, he
24  will just stay downstairs because there is a comfortable couch he can stay on.  That may happen
25  two or three times a week.  AR 442-443.  Going up stairs presents the difficulty; he can support
26  his weight on the banisters going down the stairs and therefore, once he is upstairs, he does not
27  have any difficulty returning downstairs.  AR 453.  If he rests for a twenty-four hour period,

28

4

1   Plaintiff can go back upstairs.  AR 443.  He cannot climb the stairs more than once however,

2   otherwise he will become exhausted and his feet will cramp.  AR 443.

3        Plaintiff is able to walk a quarter to one half of a block.  AR 444.  He walks around his

4   own yard, or up and down the street, but not around the block.  AR 444.  The burning and

5   cramping in his feet will cause his legs to give out.  The cramping is very painful, and his feet

6   feel as if they "want to curl."  AR 444.  It takes lying down for fifteen minutes to obtain relief.

7   Sitting down will not resolve the cramping.  AR 445.  Typically, Plaintiff can only sit for ten to

8   fifteen minutes before he would have to change his position due to discomfort.  AR 445.

9        Catnapping means lying down fifty to seventy percent of the day, said Plaintiff.  He lies

10  down this much because he can avoid discomfort that way.  The chest pains are relieved by lying

11  down.  AR 445.

12       For about a month after he had heart surgery, Plaintiff's chest pains ceased.  Then, he

13  relapsed and had two additional surgeries.  AR 440.  He currently suffers from chest pains and

14  described the pain as similar to "running into a brick wall."  The pain becomes sharper and

15  sharper and he has to either sit or lie down.  AR 441.  Plaintiff takes nitroglycerin when he

16  suffers such an episode, and did so the week prior to the hearing.  His cardiologist has advised

17  him that if he has to take more than three tablets, he should call for an ambulance.  He has

18  curtailed all activity because of the pain.  AR 441.  Once or twice a month he finds it necessary to

19  take the nitroglycerin tablets or liquid.  AR 441-442.  The chest pain is a daily occurrence and it

20  varies.  He frequently experiences chest pain when he gets emotional.  AR 446.  Asked to

21  describe the chest pain again, Plaintiff indicated the pain radiates into his left arm, creating a

22  "dead feeling."  AR 442.  The pain is very similar to the pain he felt while he was having a heart

23  attack.  AR 442.

24       According to Plaintiff, his cardiologist told him that the cramping and pain is what he has

25  to live with, and that it will worsen due to the arteriosclerosis.  AR 448.  In July 2007, the

26  cardiologist noted Plaintiff becomes short of breath after taking fifteen to twenty steps.  AR 448.

27  Plaintiff understands his cardiologist "wants to do a bunch of testing" and states the doctor "is of

28  the firm belief that [he is what he is]."  AR 452.

1    Plaintiff admitted his weight can vary between 400 and 420 pounds, depending upon the

2    mood he is in.  If he is very depressed he will "eat stuff."  Over the previous year however, he has

3    lost six pounds.  He wishes he could have lost more, however, without being more active it is

4    difficult to lose weight.  AR 449.

5    Asked to describe what he does during the day, Plaintiff indicated that he watches

6    television lying down.  He stated he gets up about 5 o'clock and "putt[s] in the yard" until about

7    8:30 or 9:00 a.m., until it gets too warm.  Then he will go inside and "mess around."  By two

8    o'clock in the afternoon he is "done" and has to lie down.  AR 449.  His wife prepares his meals

9    and helps him get around the house.  AR 449.  His wife must help him because he "is not all

10   there."  AR 450.  He no longer cooks for himself because he has left the fire on underneath the

11   pot.  AR 450.  He has to be reminded to change his clothes and to bathe.  AR 437.  Plaintiff can

12   do simple, minor things like change a light bulb, but his "mechanical ability" is limited.  As

13   another example, Plaintiff stated he can change a washer in a faucet.  AR 450.

14   Because he cannot walk in the grocery store, Plaintiff does not do the grocery shopping.

15   He can go if it is to get "one or two items," but if the shopping to be done is for a week or two

16   weeks worth of groceries, he is unable to walk to the grocery store with his wife.  AR 451.  When

17   the groceries are brought home, however, Plaintiff will hand his wife the cans to put away in the

18   cupboard.  AR 451.

19   Asked about the medications he is taking, Plaintiff indicated he takes the nitroglycerin as

20   needed, Lipitor, Ibuprofen, Wellbutrin, Lexapro, and aspirin.  He has been under a doctor's care

21   for diabetes since February and the disease is currently being treated with diet versus prescribed

22   medications.  AR 452.

23   Plaintiff cannot go back to the work he used to perform because it involves heavy lifting

24   and is stressful.  Asked about other work, Plaintiff stated he is not aware of any position that

25   would permit sitting or standing for ten to fifteen minutes only followed by a break.  He cannot

26   walk nor perform any physical task.  He cannot perform any mental task because those tasks

27   were the reason for his heart attack.  He is skeptical of performing mental tasks for that reason.

28   AR 452.  He cannot "serve hamburgers out a window" because he cannot sit or stand for the

1    necessary periods of time without requiring a break.  Plaintiff added that he would "miss days of

2    work because [he couldn't] get up that day."  AR 452-453.

3        Gloria Dustman has been married to Plaintiff since 1993.  She works from home,

4    performing tailoring and alterations, and this allows her to observe her husband "always."  AR

5    454.  He has put on a lot of weight.  Her husband is depressed and has previously expressed the

6    desire to kill himself.  Plaintiff does not socialize with family nor does he want to be around

7    people anymore.  AR 454-455.

8        Asked about her husband's activities during the day, Mrs. Dustman indicated that he lies

9    down and watches television if he is upstairs.  If he is downstairs, he sits and watches television.

10   AR 455.  Plaintiff wants to mow the lawn, but he is unable to do so.  He does not finish things

11   around the house.  For example, he cannot finish mowing the lawn or writing a letter.  Mrs.

12   Dustman said Plaintiff "just can't do anything.  His mind isn't right."  AR 455.  Asked what she

13   meant by her statement that Plaintiff's mind is not right, she said "[h]'s just not right.  He's just

14   not right."  AR 455.  She has seen her husband cry and talk to himself.  AR 455.  She cannot

15   make out what Plaintiff is saying when he speaks to himself, but stated it is "[s]cary."  AR 456.

16   Plaintiff does not interact with his children.  If they come over, he goes upstairs or "just sits

17   there."  AR 456.

18       At night, because Plaintiff is in pain, he tosses and turns and is unable to sleep well.  His

19   legs fall asleep, cramp, and cause him pain. AR 456.  That has been going on since the second or

20   third heart attack.  AR 456.

21       Plaintiff does not have much energy.  He does not help Mrs. Dustman prepare meals; she

22   does not know whether it is because he cannot do so or because he does not wish to do so.  She

23   said, "[s]omething is just not right with him."  He is depressed, "talks crazy talk" and cries.  Mrs.

24   Dustman does not know how to help her husband.  AR 457; *see also* AR 462 ("he's just not

25   right.  Just not right anymore.  He wears me out").  He does not help with the grocery shopping at

26   all.  He does not put the food away when she brings it home from the grocery store.  She takes

27   care of Plaintiff's laundry.  She does the cooking and the cleaning, and she has to "fight with him

28   to get dressed at times."  AR 457.  More particularly, she has to argue with him before he will get

1   in the shower and shave. AR 457. When he does shower, she has to stay there to be sure he does

2   not fall were his legs to give out. She calls it "scary all the way around." AR 457-458. Asked to

3   identify the last time Plaintiff's legs went out, Mrs. Dustman replied it was the week prior to the

4   hearing. AR 458.

5        The chest pain arises when Plaintiff gets emotional, but also when he's not emotional.

6   He "gets himself all riled up" and it scares her "to death." She will give him up to four

7   nitroglycerin tables to stop the pain. Plaintiff turns "colors" and she does not know what to do.

8   AR 458. The family does not have health insurance coverage. AR 458. The nitroglycerin

9   tablets are stored on the night stand or table, or in the glove box of her car or purse, "depending

10  upon what's going on." AR 459. She stated that on three occasions in the previous month, she

11  had to administer nitroglycerin to her husband. AR 459.

12       Plaintiff also has difficulty breathing, as was the case the day prior to the hearing. AR

13  459-460. It has been a constant problem for years. AR 460. Mrs. Dustman believes most of the

14  changes in Plaintiff occurred after the second surgery, rather than the third. She believes that

15  second surgery changed his "mindset." He felt worthless and wanted to kill himself. AR 460.

16       Mrs. Dustman believes the mental and physical problems are equally limiting to her

17  husband. AR 461. She is afraid to leave or take a trip because Plaintiff needs her to be there

18  with him. He cannot do anything by himself, and even if he could, "he wouldn't do it." AR 461.

19       It is not safe for Plaintiff to be in the kitchen anymore. Mrs. Dustman indicated Plaintiff

20  "almost chopped his little finger off" on one occasion. AR 461. In the past, Plaintiff has also

21  forgotten to turn the heat off on the stove and the "pot just scorched." AR 462.

22  **Medical Record**

23       The entire medical record was reviewed by the Court. Because a significant portion of

24  Plaintiff's medical record was previously summarized by Magistrate Dennis L. Beck in his order

25  of July 14, 2005, this Court will incorporate that portion below, and will then proceed to

26  summarize the subsequent medical evidence that appears in the instant record.

27           On February 10, 1998, Plaintiff had an acute myocardial infarction. AR
        291. He was admitted to Bakersfield Memorial Hospital and underwent

28

emergency angioplasty. AR 289. He was discharged on February 14, 1998, in stable condition. AR 288.

On February 26, 1998, Plaintiff underwent testing that revealed significant coronary artery disease. AR 248.

On March 31, 1998, Plaintiff underwent angioplasty and stent placement in his right coronary artery. AR 266. The procedure was successful. AR 266.

In June 1998, Plaintiff complained of chest pain and left extremity weakness. AR 276. An exercise treadmill test performed on June 9, 1998, revealed an excellent exercise capacity. AR 328.

On April 13, 1999, Plaintiff underwent a stress test that revealed evidence of ischemia in the inferior wall, which suggested possible right coronary artery restenosis. AR 322.

On May 21, 1999, Plaintiff was admitted to Bakersfield Memorial Hospital for placement of a second stent in his right coronary artery. AR 280-281. His discharge diagnoses were angina pectoris, coronary artery disease and arteriosclerotic heart disease. AR 282. He was discharged in stable condition. AR 282.

On June 10, 1999, Plaintiff indicated to his treating physician, Kirit R. Desai, M.D., that he was feeling well except for pain in his left elbow. AR 319. He was advised to return in two months. AR 319.

On June 24, 1999, State Agency physician Arthur Jing, M.D. completed a Physical Residual Functional Capacity Assessment form. AR 63. He opined that Plaintiff could occasionally lift/carry 20 pounds, 10 pounds frequently, stand and/or walk about six hours in an eight hour workday, and sit about six hours in an eight hour workday, and was unlimited in his ability to push and pull. AR 64. Plaintiff had to avoid concentrated exposure to extreme cold and heat and hazards. AR 67.

On August 26, 1999, Plaintiff saw Dr. Desai and complained of burning and indigestion. AR 318. He was advised to stop smoking and file for permanent disability because of his recurrent anginal pain and significant coronary artery disease. AR 318. Dr. Desai recommended treadmill testing for further evaluation of his chest pain. AR 318.

On October 11, 1999, Dr. Desai wrote a letter to Plaintiff's attorney. AR 316. He listed Plaintiff's medical problems as refractory angina pectoris, chronic ischemic heart disease, atherosclerotic heart disease and previous myocardial infarction, hyperlipidemia, and obesity. AR 317. Dr. Desai advised Plaintiff that he was permanently disabled, and advised him to stop smoking, lose weight, and avoid heavy exertional activities. AR 317.

On October 21, 1999, Plaintiff underwent an exercise tolerance test. AR 292. Plaintiff did not have any cardiac dysrythmias but complained of chest pain at the end of the test. AR 292. The test was negative for exercised induced myocardial ischemia. AR 292.

On November 23, 1999, State Agency physician Edwin G. Wiens, M.D. completed a Physical Residual Functional Capacity Assessment form. AR 77. He opined that Plaintiff could occasionally lift/carry 20 pounds, 10 pounds frequently, stand and/or walk about six hours in an eight hour workday, and sit about six hours in an eight hour workday. AR 78. He could occasionally climb and had to avoid concentrated exposure to extreme cold and heat . AR 81. Dr. Wiens noted that Plaintiff's subjective allegations were not supported by his performance on a recent stress test. AR 82.

A December 30, 1999 exercise tolerance test was negative for exercise-induced myocardial ischemia. AR 473.

On January 18, 2000, Plaintiff saw Dr. Desai and complained of chest pain that was relieved by burping. AR 471. Dr. Desai advised Plaintiff to stop drinking beer. AR 471.

On April 28, 2000, Plaintiff was evaluated by board-certified internist Robert M. Gromis, M.D. AR 337. Plaintiff described his work-related stress and indicated that he returned to work about a month after his February 1998 heart attack. AR 347. Plaintiff continued to work until January 15, 1999, when he was terminated due to down-sizing. AR 354. Plaintiff complained of stress, tension, anxiety, difficulty sleeping, headaches, bowel movement irregularity, and heartburn. AR 356. Dr. Gromis opined that, despite Plaintiff's heart attack, there was "no evidence of any significant left ventricular dysfunction and . . . he appears to have normal left ventricular function at rest and after exercise." AR 264. Dr. Gromis opined that Plaintiff's chest pain was non-cardiac in origin and could be associated with gastroesophagitis reflux. AR 364. Dr. Gromis concluded that Plaintiff was not disabled and that his major factor was related to inactivity and morbid obesity. AR 365. He indicated that Plaintiff would be restricted to light work and should avoid more than ordinary amounts of emotional stress. AR 376. From an internal medicine cardiovascular standpoint, he described Plaintiff as having a moderate disability. AR 376.

On May 4, 2000, Plaintiff underwent a treadmill test that was negative for exercise-induced myocardial ischemia. AR 467.

On June 14, 2000, Dr. Gromis confirmed his earlier findings in a supplemental report. AR 331-336.

On September 21, 2000, Dr. Desai wrote a letter to Plaintiff's attorney and indicated that he "sincerely believe[d]" that Plaintiff's cardiac symptoms were aggravated by his obesity, which contributes to his incapacity for sustained work. AR 379.

On November 14, 2000, Plaintiff told Dr. Desai that he had occasional chest pains and was very fatigued and tired. AR 383. He advised Plaintiff to stop smoking, walk regularly, and lose weight. AR 383.

Plaintiff saw Dr. Desai on March 19, 2001, and complained that he was very fatigued and tired. AR 382. He was advised to stop smoking and to return in two months. AR 382.

On May 18, 2001, Plaintiff saw Dr. Desai and indicated that he was feeling better but was still smoking. AR 381. He was advised to continue his current medications, stop smoking, and return in three months. AR 381.

On May 31, 2001, a State Agency physician completed a Physical Residual Functional Capacity Assessment form. AR 456. The physician opined that Plaintiff could occasionally lift/carry 20 pounds, 10 pounds frequently, stand and/or walk at least two hours in an eight hour workday, and sit about six hours in an eight hour workday. AR 457.

On June 18, 2001, in a letter to Plaintiff's attorney, Dr. Desai indicated that Plaintiff's morbid obesity causes aggravation of his underlying atherosclerotic heart disease and hypertension. AR 380. Because of his morbid obesity, Dr. Desai indicated that Plaintiff was totally disabled. AR 380.

On July 24, 2001, Plaintiff was examined by Ashok Behl, M.D. AR 435. He noted that Plaintiff's electrocardiogram was normal. AR 436. He diagnosed angina pectoris occurring on exertion and during stressful situations, exertional dyspnea, possibly secondary to underlying arteriosclerotic heart disease, previous myocardial infarction, hypertensive cardiovascular disease and obesity, chronic hypertension with hypertensive cardiovascular disease, hyperlipidemia and obesity. AR 436-437. He stated that Plaintiff "seem[ed] to be limited in his activities because of the patient's symptoms of exertional fatigue, exertional dyspnea and exertional chest pains as well as chest pains brought on during stressful situations." AR 437.

On July 24, 2001, Dr. Behl completed a Medical Source Statement and opined that Plaintiff's impairment affected his ability to lift/carry, stand/walk and push/pull. AR 430-431. He also indicated that Plaintiff should have limited

10

exposure to extreme temperatures, dust, humidity/wetness, hazards, fumes, odors, chemicals and gases.  AR 433.

On January 15, 2002, Dr. Desai completed a Functional Capacities Evaluation and opined that Plaintiff could sit for two hours, stand for two hours, and walk for one hour in an eight hour workday.  AR 498.  He could never bend, squat, or crawl, but could occasionally climb and reach above shoulder level.  AR 498.  He could occasionally lift and carry up to 10 pounds.  AR 498.

On April 11, 2003, Lakhjit Sandhu, M.D., examined Plaintiff.  AR 499. Dr. Sandhu noted that Plaintiff had multiple medical problems (angina pectoris, hypertension, hypercholesterolemia, smoking, and history of myocardial infarction, angioplasty and stent placement) and needed to lose weight and stop smoking.  AR 500.  Due to lack of insurance, Plaintiff could not receive treatment to rule out right coronary artery restenosis.  AR 500.  Dr. Sandhu "suggested that the patient may be given one year of disability and during this time he should be able to get his medical treatment and possibly angiography, and, if indicated, coronary intervention."  AR 500.  If Plaintiff could not get proper treatment and was unable to lose weight, he may "need permanent disability."  AR 500.

On August 28, 2003, Dr. Desai wrote a letter explaining that because of his cardiac condition, which is aggravated by his morbid obesity, Plaintiff should be considered disabled and should be granted disability benefits.  AR 502.

(Case No. 1:04-cv-06177-DLB, Docket No. 15 at 4-8.)

***Medical Evidence Subsequent to July 2005***

In an October 20, 2003, follow up evaluation, Plaintiff advised Dr. Desai that "he gets symptoms of chest pain about once a month and has to take nitroglycerin."  AR 319.  Dr. Desai's clinical impression after examination included atherosclerotic heart disease, hypertension, hyperlipidemia and morbid obesity.  He recommended Plaintiff return for a follow up visit in six months, and cleared Plaintiff for a dental extraction, but advised an epinephrine injection should be avoided.  AR 319.

State agency physician Lavanya Bobba, M.D., completed a Physical Residual Functional Capacity Assessment on or about September 3, 2004.  AR 305-312.  After reviewing Plaintiff's medical record, Dr. Bobba found that Plaintiff was capable of lifting and carrying ten pounds frequently and occasionally, could stand or walk for two hours in an eight-hour workday and sit about six hours in an eight-hour workday, and no limitation was imposed regarding pushing or pulling.  AR 306.  Dr. Bobba did not identify any postural, manipulative, visual, communicative, or environmental limitations.  AR 307-309.  It was noted Plaintiff's symptoms are attributable to the impairments claimed, however, the severity and duration of the symptoms is disproportionate to the expected severity or duration.  AR 310.  In Dr. Bobba's opinion, a sedentary RFC was

1  appropriate.  AR 311.  John Bonner, M.D., reviewed the evidence and affirmed Dr. Bobba's

2  assessment on December 19, 2004.  AR 312.

3        On November 2, 2004, board-certified psychiatrist Shailesh C. Patel, M.D., performed an

4  examination at the request of the Commissioner.  AR 338-340.  Plaintiff advised Dr. Patel that he

5  had two heart attacks in 1998 and has been disabled as a result.  He has been depressed for the

6  past two and a half years and it is getting worse.  He can no longer "do many activities" or walk

7  far.  Three months prior to the examination, Plaintiff contemplated suicide.  His sleep is

8  disturbed, and he feels hopeless.  While at times he "sees shadows," he denied hearing voices.

9  AR 338.  Plaintiff denied any history of psychiatric hospitalization or suicide attempts, or other

10  history of depression.  AR 338.

11        Plaintiff advised Dr. Patel that he lives with his wife and his day consists of getting up

12  and getting coffee, working a bit in the yard, then socializing with family.  AR 338.  Plaintiff

13  denied alcohol or drug use, having stopped drinking alcohol three years prior.  AR 339.

14        Dr. Patel's mental status examination findings include notations that Plaintiff was well

15  groomed, did not display psychomotor agitation or retardation, and made no abnormal

16  movements.  His speech was normal, eye contact was good, and he was cooperative throughout.

17  No compulsive behavior was noted and Plaintiff's posture and gait were normal.  AR 339.  His

18  affect was appropriate.  His thought process was coherent and content was appropriate.  Plaintiff

19  denied any suicidal or homicidal ideation.  He was not preoccupied by internal stimuli and was

20  alert and oriented to all spheres.  Plaintiff's recent and remote memory were noted to be fair and

21  his fund of knowledge was good.  Judgment and insight were fair as well.  AR 339.  A diagnosis

22  of adjustment disorder with depressed mood was identified by Dr. Patel.  A prognosis of "fair to

23  guarded" was noted.  Dr. Patel believed Plaintiff possessed the ability to interact with others and

24  to understand, remember and carry out simple instructions.  The doctor noted that Plaintiff's

25  attention and concentration were good.   AR 340.

26        On December 14, 2004, John T. Bonner, M.D., completed a Psychiatric Review

27  Technique.  AR 341-354.  Dr. Bonner determined Plaintiff suffers from an affective disorder

28  with depressed mood.  AR 344.  No other psychiatric disorders were identified.  Dr. Bonner

1  found no functional limitation whatsoever.  AR 351.  In a functional capacity assessment of that

2  same date, Dr. Bonner found that Plaintiff was not significantly limited as to understanding and

3  memory, sustained concentration and persistence, social interaction or adaptation.  AR 355-356.

4  Dr. Bonner concluded that Plaintiff has the ability to understand and remember simple tasks, to

5  sustain concentration, persistence and pace for an eight-hour work day, forty hours per week, and

6  can adapt to changes in the workplace and handle the general work environment.  AR 357.

7  In a Mental Disorder Questionnaire Form dated June 16, 2006, board certified psychiatrist

8  and neurologist Pamela Alfafara, M.D., indicated she first examined Plaintiff on August 26,

9  2005, and has been treating him every four to eight weeks since.  AR 368.  Her general

10 observations include a notation that Plaintiff's wife helps him remember his appointments, and

11 that he had been using a cane to ambulate recently.  AR 364.  Plaintiff reported sadness,

12 decreased interest and lack of enthusiasm, lack of energy, motivation and sleep disturbance, and

13 increased appetite.  AR 364.  The doctor noted Plaintiff's ability to relate well and cooperate,

14 with "coherent and spontaneous speech."  It was noted Plaintiff is alert and oriented to time,

15 place and reason.  The doctor believed Plaintiff to be of average intelligence with "fair insight

16 into his condition with fair judgment."  Other than "seeing some shadows at the corner of his

17 eyes at times," Plaintiff denied visual or auditory hallucinations.  AR 365.  Dr. Alfafara indicated

18 Plaintiff is capable of taking care of his personal grooming and hygiene needs, however, he does

19 not help with household chores, and his wife does most of the shopping and cooking.  AR 366.

20 Regarding social functioning, the doctor's notes indicate Plaintiff is "isolative" and does not

21 interact much with family members during gatherings.  AR 367.  Dr. Alfafara found Plaintiff

22 capable of following and understanding simple instructions, but noted he "has difficulty with

23 ability to sustain focused attention especially for long periods of time."  AR 367.  The doctor

24 believed Plaintiff would have difficulty adapting to stresses common in the work environment.

25 AR 367.  Dr. Alfafara prescribed Wellbutrin and Lexapro for maintenance of Plaintiff's

26 depression.  AR 368.

27 In a June 25, 2007, Medical Source Statement of Ability to do Work-Related Activities,

28 Dr. Alfafara indicated Plaintiff was mildly limited in the area of carrying out simple instructions,

13

moderately limited in understanding and remembering simple instructions, and markedly limited in his ability to make judgments on simple work-related decisions, the ability to understand and remember complex instructions, carry out complex instructions, and in the ability to make judgments on complex work-related decisions.  AR 375.  The doctor believed Plaintiff was mildly limited in his ability to interact appropriately with the public, and moderately limited in his ability to interact with supervisors and co-workers.  Finally, Dr. Alfafara believed Plaintiff was markedly limited in his ability to respond appropriately to routine changes in usual work situations and changes in routine work setting.  AR 376-377.

Generally, the treatment notes kept by Dr. Alfafara reflect Plaintiff routinely felt "fine," or "okay" during his sessions.  AR 371-373, 380, 382-383.

On July 3, 2007, Dr. Desai provided a letter to Plaintiff's attorney, wherein the doctor noted Plaintiff is significantly limited by atherosclerotic heart disease, previous myocardial infarction, morbid obesity, and diabetes mellitus.  AR 384.  Dr. Desai opined that Plaintiff was advised "he should go on permanent disability" and it was the doctor's professional opinion that Plaintiff "should be granted this disability based on his medical condition."  AR 385.

**ALJ's Findings**

The ALJ found that Plaintiff last met the insured status requirements on December 31, 2004, and had not engaged in substantial gainful activity between the period of December 24, 2003, and the date-last insured.  The ALJ found Plaintiff had the severe impairments of obesity, history of coronary artery disease, and adjustment disorder with depressed mood.  Nonetheless, the ALJ determined that the severe impairments did not meet or exceed one of the listed impairments.  AR 17.

Based on his review of the medical evidence, the ALJ determined that Plaintiff has the residual functional capacity to perform light work, except that he could perform only simple repetitive tasks with no public contact.  AR 17.  The ALJ also determined that Plaintiff was unable to perform any past relevant work.  AR 18.

The ALJ determined that Plaintiff was forty-eight years old on the date last-insured, or "a younger individual age 18-49," with at least a high school education and the ability to

14

communicate in English, and thus transferability of job skills was not material because the

Medical-Vocational Rules support a finding of not disabled.  Through the date last-insured, the

ALJ determined that, considering the Plaintiff's age, education, work experience, and residual

functioning capacity, there are jobs that exist in significant numbers in the national economy that

he can perform.  AR 19.  Accordingly, the ALJ found that Plaintiff was not disabled for the

period between December 24, 2003, and December 31, 2004, the date last-insured.  AR 19-20.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision

to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

the Court must determine whether the decision of the Commissioner is supported by substantial

evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

*Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.

Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

401.  The record as a whole must be considered, weighing both the evidence that supports and

the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

This Court must uphold the Commissioner's determination that the claimant is not disabled if the

Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in

substantial gainful activity due to a medically determinable physical or mental impairment which

has lasted or can be expected to last for a continuous period of not less than twelve months.  42

U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

such severity that he is not only unable to do her previous work, but cannot, considering his age,

1  education, and work experience, engage in any other kind of substantial gainful work which

2  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

3  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

4  Cir. 1990).

5  In an effort to achieve uniformity of decisions, the Commissioner has promulgated

6  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

7  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ

8  found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

9  his disability; (2) has an impairment or a combination of impairments that is considered "severe"

10  based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an

11  impairment or combination of impairments which meets or equals one of the impairments set

12  forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform his past relevant work;

13  and (5) could perform jobs that exist in significant numbers in the national economy.  AR 17-19.

14  Here, Plaintiff argues that: (1) a November 2009 award letter warrants remand; (2) the

15  ALJ failed to properly evaluate Plaintiff's testimony; (3) the ALJ did not properly reject treating

16  source opinions; (4) the ALJ did not properly assess the lay witness testimony; and (5) the ALJ

17  did not properly consider Plaintiff's obesity in combination.  (Doc. 15.)

18  **DISCUSSION**

19  A.   ***The November 2009 Award Letter as New and Material Evidence Warranting***
       ***Remand***

20

21  Attached as an exhibit to Plaintiff's opening brief is a letter dated November 17, 2009,

22  from a Social Security Administration office in Bakersfield, indicating that its "records show that

23  [Plaintiff] became disabled on 04/06/09."  (Doc. 15, Ex. 1.)  Plaintiff submits the letter should be

24  admitted to this record "as new and material evidence sufficient to warrant remand under 42

25  U.S.C. 405(g)."  (Doc. 15 at 9-12.)  Defendant counters that the subsequent award of disability

26  involves a period that is not relevant for purposes of the instant matter because the period under

27  review "begins on December 24, 2003, before which point Plaintiff was found not disabled in an

28

1    earlier final decision . . . and ends on December 31, 2004, Plaintiff's date last insured."  (Doc. 17

2    at 7-9.)

3         Pursuant to the provisions of Title 42 of the United States Code section 405(g), a case

4    may be remanded to the Secretary if the new evidence submitted is material, and there is good

5    cause for the failure to incorporate it into the record.  In order to be "material," the new evidence

6    must be probative of the claimant's condition as it existed during the relevant time period -- on or

7    before the administrative hearing.  *Sanchez v. Secretary of Health and Human Services*, 812 F.2d

8    509, 511 (9th Cir. 1987).  In addition, the claimant must prove to the reviewing court's

9    satisfaction that there exists a "reasonable possibility that the new evidence would have changed

10   the outcome of the Secretary's determination had it been before him."  *Booz v. Secretary of*

11   *Health and Human Services*, 734 F.2d 1378, 1380 (9th Cir. 1984).  The good cause requirement

12   is satisfied if the claimant could not have obtained the medical evidence at the time of the

13   administrative proceeding, even though the evidence surfaces after the Secretary's final decision.

14   *See Embry v. Bowen*, 849 F.2d 418, 423-24 (9th Cir. 1988); *Booz*, 734 F.2d at 1380.

15        Significantly, Plaintiff has failed to demonstrate materiality.  As pointed out by

16   Defendant, the relevant time period in question for purposes of the instant appeal is the period

17   between December 24, 2003 and December 31, 2004, or the date last insured.  *See* AR 15 ("a

18   prior unfavorable decision on December 23, 2003 . . . is administratively final"), 17 ("during the

19   period from December 24, 2003, through his date-last-insured of December 31, 2004"), 19

20   (claimant "not under disability . . . at any time from December 24, 2003, through December 31,

21   2004, the date-last-insured").  The November 17, 2009, letter is clearly not material as it was

22   issued *after* the administrative hearing of June 24, 2008.  *Sanchez v. Secretary of Health and*

23   *Human Services*, 812 F.2d at 511.

24        As to good cause, Plaintiff argues that he "could not have obtained the medical evidence

25   prior to the administrative proceeding held June 24, 2008, or through the date of the Appeals

26   Council denial on March 27, 2009 as the notice of award was issued subsequent to those dates on

27   November 17, 2009," and thus good cause exists.  (Doc. 15 at 11.)  The evidence itself is not

28   truly "medical" evidence as this Court interprets the relevant language.  Moreover, as noted

17

1    above, there must be materiality *and* good cause, yet materiality has been decided adverse to

2    Plaintiff.

3        In sum, the November 17, 2009, award letter does not warrant remand as Plaintiff argues

4    for it is not material for purposes of the instant appeal.

5        **B.**     ***Plaintiff's Credibility***

6        Plaintiff argues ALJ Larsen failed to assess his credibility, other than to note his

7    testimony failed to establish his condition had worsened following ALJ Carletti's opinion in

8    December 2003.  (Doc. 15 at 11-12.)  Defendant argues to the contrary, that ALJ Larsen provided

9    reasons for finding Plaintiff's subjective complaints not entirely credible.  Defendant also

10    contends that ALJ Larsen's adoption of ALJ Carletti's 2007 decision was not improper.  (Doc. 17

11    at 9-12.)

12        A two step analysis applies at the administrative level when considering a claimant's

13    credibility.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.1996).  First, the claimant must

14    produce objective medical evidence of an impairment that could reasonably be expected to

15    produce some degree of the symptom or pain alleged.  *Id.* at 1281-1282.  If the claimant satisfies

16    the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony

17    regarding the severity of his symptoms only if he makes specific findings that include clear and

18    convincing reasons for doing so.  *Id*. at 1281.  The ALJ must "state which testimony is not

19    credible and what evidence suggests the complaints are not credible."  *Mersman v. Halter*, 161

20    F.Supp.2d 1078, 1086 (N.D. Cal.2001), quotations & citations omitted ("The lack of specific,

21    clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for

22    [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence");

23    Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be sufficiently specific to make

24    clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

25    individual's statements and reasons for that weight").

26        An ALJ can consider many factors when assessing the claimant's credibility.  *See Light v.*

27    *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir.1997).  The ALJ can consider the claimant's

28    reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

1  testimony by the claimant that appears less than candid, unexplained or inadequately explained

2  failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

3  activities, claimant's work record, or the observations of treating and examining physicians.

4  *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (2007).

5        The first step in assessing Plaintiff's subjective complaints is to determine whether

6  Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

7  alleged.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  Here, ALJ Larsen found

8  that Plaintiff had the severe impairments of obesity, history of coronary artery disease and

9  adjustment disorder with depressed mood.  AR 17.  When making his finding as to Plaintiff's

10  RFC, the ALJ discussed ALJ Carletti's 2007 findings and the testimony taken in June 2008,

11  concluding that he found "nothing to support a change in the residual functional capacity finding

12  in the August 18, 2007 decision" (AR 18), to wit: "[Plaintiff's] medically determinable

13  impairments could have been reasonably expected to produce the alleged symptoms, but that the

14  [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these

15  symptoms are not entirely credible." AR 59.  This finding, as expressly adopted by ALJ Larsen,

16  satisfied step one of the credibility analysis.  *Smolen*, 80 F.3d at 1281-1282.

17        In the absence of a finding that Plaintiff was malingering, the ALJ was required to

18  provide clear and convincing reasons for rejecting Plaintiff's testimony.  *Smolen*, 80 F.3d at

19  1283-1284; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (as amended). When there is

20  evidence of an underlying medical impairment, the ALJ may not discredit the claimant's

21  testimony regarding the severity of his symptoms solely because they are unsupported by medical

22  evidence.  *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7.  Moreover, it is not

23  sufficient for the ALJ to make general findings; he must state which testimony is not credible and

24  what evidence in the record leads to that conclusion.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th

25  Cir.1993); *Bunnell*, 947 F.2d at 345-346.

26        In this case, ALJ Larsen found as follows:

27        Much of [Plaintiff]'s current testimony about his subjective complaints is
          similar to his testimony at the hearing that proceeded the December, 2003,
28        decision - including his statement that he uses nitroglycerin about once a month

1    (at the current hearing he said "one or two times a month"), and his statement that
2    he can only sit for a few minutes at a time, although he sat through the entire
     hearing on June 24, 2008[3] (as he did during the 2003 hearing).  Accordingly, it
3    does not appear [Plaintiff]'s condition is any worse today (three and a half years
     after his date-last-insured) than it was in 2003, when he was previously found "not
4    disabled."

5    AR 18, internal citations omitted.  The administrative record contains ALJ Carletti's findings,

6    and with regard to Plaintiff's credibility, he found as follows:

7         . . . the claimant's statements concerning the intensity, persistence and limiting
          effects of these symptoms are not entirely credible.
8              The claimant's chest pain has only been occasional during the period in
          adjudication.  For example, attending physician Desai stated in August 2003 that
9         the claimant had periods of angina, but he indicated that the claimant only was
          experiencing chest pain about once a month.  The medical expert, who reviewed
10        the entire record, did not find any evidence of any angina.  He felt that he
          claimant's chest pain was likely secondary to his obesity or stress.
11             The weight of the objective evidence does not support the claims of the
          claimant's disabling limitations to the degree alleged.
12             Physical exams show normal blood pressure and rate.  Exams of the
          claimant's cardiovascular system have been normal.  There is no documented
13        edema. [¶] Lab studies have been negative. [¶] Thallium stress test in April 1999
          showed changes suggestive of possible right coronary artery re-stenosis. [¶]
14        Echocardiogram showed an ejection fraction of 57 percent. [¶] Treadmill testing
          in May 2000 was negative for exercise-induced myocardial ischemia. [¶] Chest X-
15        ray in June 2004 sho[w]ed no acute cardiopulmonary disease.
               The record does not show that the claimant requires any special
16        accommodations (e.g., special breaks or positions) to relieve his pain or other
          symptoms.
17             In contrast to the allegations of the claimant's disabling fatigue and
          weakness, he does not exhibit any significant disuse muscle atrophy, loss of
18        strength, or difficulty moving that are indicative of severe and disabling pain.
               Although the claimant has been prescribed and has taken appropriate
19        medications for the alleged impairments, which weighs in his favor, the objective
          medical evidence shows that the medications have been relatively effective in
20        controlling the claimant's symptoms.  Moreover, the claimant has not alleged any
          side effects from the use of medications.
21             There is no evidence of loss of weight due to loss of appetite due to pain or
          depression.  There is no evidence of sleep deprivation due to pain or depression.
22             Consequently, the claimant's allegations are not credible to establish a
          more restrictive residual functional capacity . . ..
23

24   AR 59-60, internal citations omitted.

25        Plaintiff complains he "is forced to accept the ALJ's conclusions with explanation," but

26   this is simply not so.  ALJ Larsen specifically referenced but two inconsistencies in Plaintiff's

27   ───────────────

28        [3]The June 24, 2008, hearing commenced at 10:54 a.m. and concluded at 12:02 p.m., for a total of sixty-
     eight minutes.  *See* AR 423 & 463.

testimony: the use of nitroglycerin for chest pain and his ability to sit for only a few minutes at a time. *See Smolen*, 80 F.3d at 1284; *Orn*, 495 F.3d at 638; *see also Morgan v. Commissioner*, 169 F.3d 595, 600 (9th Cir. 1999) (observations of the ALJ are acceptable as long as they are not the sole basis for the credibility determination). ALJ Larsen then proceeded to incorporate ALJ Carletti's credibility findings, which identifies further inconsistencies and a lack of objective medical evidence. These too are specific and legitimate reasons.

Assuming for the sake of argument that it was improper for ALJ Larsen to incorporate ALJ Carletti's credibility determination, reversal is not required because a credibility determination may be upheld even where one reason may have been in error. *See eg., Batson v. Barnhart*, 359 F.3d 1190, 1197 (9th Cir. 2004); *Carmickle v. Commissioner of Social Sec. Admin.*, 533 F. 3d 1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal").

Therefore, the credibility determination is supported by substantial evidence and ALJ Larsen did not err.

**C.**    ***The Weight Afforded to Treating Physicians Desai & Alfafara***

Plaintiff argues that the ALJ failed to provide adequate reasons for rejecting the opinions of Plaintiff's treating physicians, and improperly relied upon the opinion of John Morse, M.D., who testified at the earlier administrative hearing. (Doc. 15 at 12-15.) Defendant claims the ALJ did not err as he provided sufficient reasons for the weight assigned to the opinions of Plaintiff's treating physicians. (Doc. 17 at 12-17.)

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

1    providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id*.

2    (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).  This can be done by setting out

3    a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

4    interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.

5    1989).  The ALJ must do more than offer his conclusions.  He must set forth his own

6    interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849

7    F.2d 418, 421-22 (9th Cir. 1988).  Therefore, a treating physician's opinion must be given

8    controlling weight if it is well-supported and not inconsistent with the other substantial evidence

9    in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028.

10         In *Orn v. Astrue*, 495 F.3d 625, the Ninth Circuit reiterated and expounded upon its

11   position regarding the ALJ's acceptance of the opinion an examining physician over that of a

12   treating physician.  "When an examining physician relies on the same clinical findings as a

13   treating physician, but differs only in his or her conclusions, the conclusions of the examining

14   physician are not '"substantial evidence."'  *Orn*, 495 F.3d at 632; *Murray*, 722 F.2d at 501-502.

15   "By contrast, when an examining physician provides 'independent clinical findings that differ

16   from the findings of the treating physician' such findings are 'substantial evidence.'"  *Orn*, 496

17   F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).  Independent clinical findings

18   can be either (1) diagnoses that differ from those offered by another physician and that are

19   supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1985), or (2)

20   findings based on objective medical tests that the treating physician has not herself considered,

21   *see Andrews*, 53 F.3d at 1041.

22         If a treating physician's opinion is not giving controlling weight because it is not well

23   supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

24   instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6)

25   in determining what weight to accord the opinion of the treating physician.  Those factors include

26   the "[l]ength of the treatment relationship and the frequency of examination" by the treating

27   physician; and the "nature and extent of the treatment relationship" between the patient and the

28   treating physician.  20 C.F.R. § 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility

1   of the opinion, consistency with the record as a whole, the specialization of the physician, and the

2   extent to which the physician is familiar with disability programs and evidentiary requirements.

3   20 C.F.R. § 404.1527(d)(3)-(6).

4        Here, ALJ Larsen found as follows:

5             I have considered the opinion of Dr. Bobba (state agency physician) . . ..
    On September 3, 2004, Dr. Bobba concluded Mr. Dustman was capable of

6   a full range of sedentary work by adopting the finding in the December, 2003,
    ALJ decision.  However, Dr. John Morse, the medical expert who testified at the

7   June 2, 2007 hearing, concluded Mr. Dustman could do light work.  As Dr. Morse
    had the opportunity to review the entire record, including additional evidence not

8   available to Dr. Bobba in September, 2004, I have given Dr. Morse's opinion
    greater weight.  In addition, Dr. Morse has greater expertise in the field of

9   medicine directly related to Mr. Dustman's cardiac impairment, as he is board-
    certified in internal medicine with subspecialty certification in cardiovascular

10  disease.

11  AR 18, internal citations omitted.  ALJ Larsen provided a specific and legitimate reason for

12  rejecting Dr. Bobba's finding: he gave greater weight to Dr. Morse's opinion where the

13  consulting physician reviewed Plaintiff's entire medical record, and where Dr. Morse is an

14  internist with a cardiovascular specialty.  *See* 20 C.F.R. § 416.927(d)(5).

15       ALJ Carletti stated the following:

16            As for the opinion evidence, I have given little weight to the opinions of
    attending physician Kirit Desai, M.D., contained in a letter dated August 28, 2003

17  and contained in his letter dated July 3, 2007.  Dr. Desai opined that the claimant
    was permanently disabled secondary to atherosclerotic heart disease, prior

18  myocardial infarction, morbid obesity, and newly developed diabetes mellitus. He
    felt that due to symptoms of shortness of breath and angina, the claimant was not

19  able to walk at all.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

20            He does not indicate when the condition has reached the point that he
    determined that the claimant had reached such a debilitating condition.  This is

21  important as he authored this opinion in July 2007 and the end of the period in
    issue in December 2004.  When merely considering the speculative nature of

22  his opinion, his opinion is given little weight.
              His opinion is further discounted as it appears that he has premised his

23  opinion of disability to a large extent on the claimant's own accounts of his
    symptoms and limitations.  His opinion may be disregarded when those

24  complaints have been properly discounted as was set forth in great detail above.
    Importantly, Dr. Desai has emphasized that the claimant's condition has been

25  "slowly progressive to the point that he is not able to walk at all."
              While Dr. Desai premised his finding of disability due to angina, the

26  medical expert, who reviewed the entire record, did not find any evidence of any
    angina.  He felt that the claimant's chest pain was likely secondary to his obesity

27  or stress.
              Dr. Desai also based the opinion of disability [in part] due to [the

28  claimant's] shortness of breath. However, the medical expert opined that the

1    shortness of breath and exercise intolerance was secondary to obesity or his
     depressive feelings.

2          Dr. Desai's own progress notes do not show supportive clinical signs and
     symptoms [of disability].

3          From a mental standpoint, I have given little weight to the opinion of
     Pamela Alfafara, M.D., dated June 25, 2007, contained in the form . . . . .  As in

4    the case of the opinion of Dr. Desai, this opinion in June 2007 is too far removed
     from the end of the period in issue in December 2004.  Further, the first

5    documentary evidence of record is in August 2005 when he was evaluated for his
     depressive symptoms.  Both the evidence and this opinion have occurred after the

6    date last insured.  Therefore, I give her opinion little weight.

7    AR 60-61, internal citations omitted.

8          ALJ Larsen expressly incorporated ALJ Carletti's discussion regarding the weight of the

9    treating physician evidence.  With regard to the opinion of treating physician Desai, the ALJ

10   provided specific and legitimate reasons in the form of consistency with the record as a whole, a

11   lack of objective medical tests and reliance upon Plaintiff's subjective complaints.  With regard

12   to the opinions of both Dr. Desai and Dr. Alfafara, the ALJ noted that the opinions were also

13   dated after the disability period at issue: that is, December 31, 2004.  This is a specific and

14   legitimate reason for affording an opinion less weight than opinions that were relevant to the time

15   period at issue.

16         In sum, the ALJs provided specific and legitimate reasons supported by substantial

17   evidence in the record for an assignment of little weight to the opinions of Drs. Desai and

18   Alfafara, as well as for a rejection of the opinion of state agency physician Bobba.  The ALJ

19   assessments are supported by substantial evidence and are free of error.

20         **D.**    ***Lay Witness Testimony***

21         Plaintiff complains the ALJ failed to properly assess the testimony of Plaintiff's wife.

22   More particularly, Plaintiff assigns error where the ALJ noted that Mrs. Dustman's testimony

23   was not sufficiently specific and instead reflected her disappointment and frustration with her

24   husband's condition.  (Doc. 15 at 16-18.)  The Commissioner contends ALJ properly considered

25   and evaluated the lay witness testimony offered below.  (Doc. 17 at 17-19.)

26         Lay witness testimony as to a claimant's symptoms is competent evidence which the

27   Commissioner must take into account.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  The

28   ALJ may reject such testimony if he does so expressly, in which case "he must give reasons that

24

1    are germane to each witness." *Id.*  The ALJ need not discuss lay witness testimony that pertains

2    to whether or not an impairment exists. *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996).

3    These medical diagnoses are beyond the competence of lay witnesses and therefore do not

4    constitute competent evidence.  20 C.F.R. § 404.1513(a).  However, once an impairment has

5    been established by medical evidence, the extent of the diagnosed impairment may be testified to

6    by the lay witnesses.  20 C.F.R. § 404.1513(e); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir.

7    1987).

8        Here, as directed by the Appeals Council, ALJ Larsen considered Plaintiff's wife's

9    testimony:

10           With regard to [Plaintiff]'s spouse, it reflects her understandable
     disappointment and frustration in her husband's condition, but it is confusing and
11   does not provide specifics about his functional capacity.  For example, she checks
     a box to indicate [he] can go out alone, and goes to the corner store for milk, yet
12   on the very next page avers he "does not go out any more."  She also
     acknowledges he drives.  She indicates he "has a difficult time" lifting, squatting,
13   bending, standing, reaching, walking, sitting, kneeling, and climbing stairs,
     without quantifying any of those limitations.  Consequently, this statement does
14   very little to help me determine [Plaintiff]'s residual functional capacity.
     [Plaintiff]'s spouse also testified at the hearing held June 24, 2008.  She said that
15   he talks to himself and "[h]is mind isn't right.  He's just not right."  But she also
     indicated his problems date back to his "second surgery," which pre-dates Judge
16   Carletti's December, 2003, decision finding [him] "not disabled."

17   AR 18, internal citations omitted.  Plainly, ALJ Larsen took Gloria Dustman's statements and

18   testimony into consideration. *Dodrill v. Shalala*, 12 F.3d at 919.  Thereafter, he gave germane

19   reasons for rejecting her testimony.  First, he identified inconsistencies in her own statements, a

20   proper consideration. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005)

21   (inconsistency is a valid reason for rejecting a lay witness's testimony).  The ALJ went on to note

22   a failure to quantify Plaintiff's purported limitations, and the fact Mrs. Dustman assigned these

23   problems back to a period in which it has already been determined that Plaintiff was not disabled.

24   The ALJ's comment about the lack of information regarding the purported limitations is well

25   taken.  Without more, one cannot quantify "has a difficult time," particularly where that vague

26   language is assigned to no less than nine physical movements that are to be considered for

27   purposes of an RFC finding. *Sprague v. Bowen*, 812 F.2d at 1232.  Additionally, it was not

28   improper for the ALJ to consider Mrs. Dustman's comment about the timing of Plaintiff's

purported disability where the time frame referenced is outside the relevant period for purposes of the ALJ's determination.

In sum, the ALJ's findings regarding Mrs. Dustman's credibility is proper, supported by substantial evidence and is free of legal error.

### E.    *Plaintiff's Obesity in Combination with his Cardiac Condition*

Next, Plaintiff complains that the ALJ failed to adequately consider his obesity in combination with his cardiac condition, as it was particularly important that Plaintiff has "consistently weighed 400 lbs and has a history of two heart attacks with stent replacements." (Doc. 15 at 18-19.)  The Commissioner replies that the ALJ properly considered these severe impairments together.  (Doc. 17 at 19-20.)

Pursuant to SSR 02-1p, obesity must be considered throughout the sequential evaluation process, including when determining an individual's RFC.  "The combined effects of obesity with other impairments may be greater than might be expected without obesity."  SSR 02-1p. The Ninth Circuit held that, pursuant to SSR 02-1p, the ALJ must consider obesity in determining RFC based on the information in the case record.  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  In *Burch*, the ALJ did not find that the claimant's obesity, in combination with her other impairments, met a Listing.  *Burch*, 400 F.3d at 682-683.  The court held that this was not reversible error, as it is the claimant's burden to prove that she has an impairment that meets or equals the criteria of an impairment in the Listings.  *Id.* at 683.  An "ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."  *Id.*

ALJ Larsen, like ALJ Carletti before him, determined that Plaintiff's obesity was a severe impairment.  AR 17, 58.

During the earlier administrative hearing, Dr. Morse testified that, in relevant part:

. . . we don't have any objective data that this chest pain is angina.  He could, he could have chest pain for any number of reasons, his obesity not the least of which could produce shortness of breath and chest pains.  But, in spite of the fact that he has chest pain and in spite of the fact he takes nitroglycerin and that stress or emotions seem to bring it on, it is not established in this record that it's angina.

And the only thing I have to look at the record is, is his last negative stress test in May of 2000.  In would, I would think it likely is probably not angina given the fact that these stents once they are in place do stabilize and that his left coronary circulation was normal at the time.  So it's, it's possible that the chest pains are not angina at all in spite of some of the typical features which are not brought out on questioning.   In that regard also, I think his leg pains are clearly not due to vascular disease.  They may be but there's nothing in the record to suggest that they are.  This is not claudication per se.  If it is we would need, we would need specific data to indicate the arteries involved and the amount of obstruction.  His description of his discoloration of his lower extremities are usually based on venous insufficiency which is due to his morbid obesity.  So, to make this analysis a little more concise, I'm not convinced as, as a reviewer, in spite of the fact that he takes nitro and in spite of the fact that he complains of chest pains, that this is, this is angina. This could be due to any number of causes which are at this point ill defined.  I believe his exercise intolerance and his shortness of breath are a function of his obesity and/or his depression. . . . His obesity is an ongoing issue.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

    Well, again, [the] main physical condition would be the 400 pounds, not his cardiac disease.  I , I think his heart function could very well be normal. If it isn't normal we would have to see some information to, to instruct me that it's not normal.  But based on his last stress test I, I think that the obesity is the limiting factor and I, I would, you know, common sense realistically he would be in a light category I would think and he would have to avoid scaffolds and ladders and hazardous machinery and this, that sort of thing.

AR 411-413.

    By adopting ALJ Carletti's RFC findings, ALJ Larsen did indeed consider Plaintiff's

morbid obesity in combination with his cardiac condition. *Burch v. Barnhart*, 400 F.3d at 683.

Moreover, because Plaintiff did not meet his burden of establishing any severe impairment met

or exceeded a listing impairment, the ALJ committed no error. *Id.*

//

//

//

//

//

//

//

//

//

//

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Robert J. Dustman.


IT IS SO ORDERED.

**Dated:** __**September 28, 2010**__        _____/s/ **Gary S. Austin**_____
                                UNITED STATES MAGISTRATE JUDGE